The Judges delivered their opinions. *
Judge Green.
Picot having purchased a house and lot of Adams’s executors, executed his negociable notes for the purchase money to Page, the executor of Byrd, who knew the consideration for which the notes were; given; it being for the purchase of property, to which Page had claimed a title, on behalf of his testator’s estate, and he having released that claim for a stipulated sum to be paid by Adams’s executors. The notes of Picot were given in part satisfaction thereof. These notes were assigned to Lomax, for a *248 valuable consideration, upon the previous assurance of Pi-co^ that they should be duly paid. Lomax had notice of the consideration for which the notes were originally given. Picot had executed to Page a deed of trust on the property, for the purchase money of which the notes had been given, for securing the payment of the notes. One of the notes being protested for non-payment, the trustees, at the instance of Lomax, were about to proceed to sell the property, according to the terms of the deed, when Picot exhibited his bill, charging the- facts above stated, and that he had latety discovered that the title to the house and lot was fatally defective, and that one of Adams’s executors had become insolvent, and the other is dead, and probably insolvent; and praying an injunction to the intended sale, which was awarded. This injunction being awarded, without security, and the cause coming on to be heard on the 20th of June, 1822, was ordered to stand over for the trial of another suit, between other parties, involving the title to the house and lot; and, upon the motion of Lomax, it was referred to a commissioner, to enquire whether the house and lot was sufficient security for the debt. Lomax having prosecuted suits at law upon two of the negociable notes, and recovered judgments thereon, Picot exhibited his bill, praying an injunction to the judgments, and setting forth, in substance, the same equity as that alledged in his former bill, and that the house and lot were ample security for the balance of the purchase money. Upon which, the Chancellor, on the 26th of April, 1823, awarded the injunction, upon conditions; 1st, “that the plaintiff enters into bond with security to the plaintiff at law, in a penalty equal to the double of that sum which commissioner Baker shall, after notice to the parties to this bill, ascertain to be the deficiency, if any, of the lot in question, to secure any balance of the purchase money now in question; and, 2d, that the plaintiff also release all errors, if any, in the judgments at law. When commissioner Baker shall have made his re *249 port, in conformity with this order, to the Clerk’s office of this Court, the Clerk will endorse the sum, if any, in which the plaintiff is to give bond and security in the law Court, or in the Clerk’s office thereof, where also the release will be executed.”
The commissioner reported, that the house and lot were a sufficient security.
On the 4th of June, 1823, Lomax not having answered, moved to dissolve the injunction, unless bond and security should he given by the plaintiff, for the prosecution thereof, which motion was over-ruled. Whereupon, on the same day, Lomax filed his answer, insisting, that he was not affected by any equity which the plaintiff might have against Adams or Page. On the 9th of June, leave was given the plaintiff to amend his bill and make new parties; and, on the 17th of June, Lomax having answered, moved again to dissolve the injunction, on the merits, which the Court over-ruled, and “further continued the injunction, until the other answers come in,” “and thereupon, the defendant Lomax prayed an appeal, for the purpose of settling the principles of the cause.” The Court refused to allow the appeal prayed for, upon the ground, that the Judge had no authority for it. Thereupon, Lo-max applied to one of the Judges of this Court for an appeal, in general terms, alledging, in his petition, that all the orders in the cause were erroneous; and an appeal was allowed from all the orders in the cause.
I have some doubts, whether, upon these proceedings, the appeal ought not to be considered as allowed regularly from the last order only. But, that is not material; for, if the appeal be confined to that, and, as to that, were properly awarded, and that order should be found to be erroneous, then all other errors, in the former proceedings, should be corrected, if erroneous; as in the case of an appeal from a final decree, not only any error in that, but any error in the former proceedings ought to be corrected..
*250 The first enquiry in this case is, whether the order of the ]. 7^ 0f Jun6j ig23, over-ruling the motion to dissolve, and continuing the injunction until the other answers should come in, was such an order as might be appealed from. This depends on the just construction of the act of 1818, chap. 66, § 57, which provides in substance, that in any cause depending in any Superior Court of Chancery, wherein any interlocutory order or decree hath been or shall be made, the Court or Judge in vacation, before a final decree, may grant an appeal from such interlocutory order or decree, provided, money is required to be paid, or property changed, “ or the Court shall think such appeal proper, in order to settle the principles of the cause, or to avoid expense and delay.” And if such appeal be refused, the Court of Appeals, or a Judge thereof, in vacation, may grant an appeal from such order or decree, for any error therein.
If this section stood alone, it would hardly be doubted, that an order refusing to dissolve an injunction and continuing it until the answers of other parties should come in, founded upon the avowed opinion of the Court, that the plaintiff would be entitled to full relief, in the event of those other parties, or any of them, claiming and establishing a title to the property in question, would be such an order, that, upon an appeal therefrom, the principle might properly and finally be settled, whether upon the facts of the case, the assertion and establishment of such title, would or would not entitle the plaintiff to relief; this being the only principle involved in the cause, and an important one; or that such an order, requiring that a multitude of other • parties should be brought before the.Court, for the purpose of litigating the title in question, and continuing the injunction until their answers came in, and in effect (if they claimed title, as they already had in another cause in the same Court,) until their rights were ascertained, would be such an order as, from which, if erroneous, an appeal ought to *251 be allowed, according to the letter and spirit of the statute, in order to avoid expense and delay. The delay must necessarily he great, and the defendant, from considerations of prudence, would encounter a great expense in supporting the title of the plaintiff, when, in the final event, it might turn out, that it was a matter of utter indifference to him, whether Picol or any of the other parties had the better title, so far as his interests were concerned.
But, it is said, that whatever might be the just construction of this section, standing alone, yet, taking into view another section of the samo act, and the history of our legislation in relation to appeals from interlocutory decrees and orders, and from orders dissolving injunctions, the order in question does not come within the meaning or policy of the 57th section of the act, and no appeal properly lay from it. Originally, the Court of Appeals had no jurisdiction, but upon appeals from final decrees and judgments. The construction given by the Court to the statute prescribing this rule, was so strict, that so long as any thing could be done in the cause in the Court below, even if it were only to superintend the carrying into effect the decree, which ascertained, conclusively, the rights of all the parties, as in the case of a. decree of foreclosure and sale, no appeal could be allowed. Inconvenience was felt from this rule, and in 1798 it was enacted, “that it shall be lawful for the High Court of Chancery, upon any interlocutory decree, where the right claimed shall he affirmed or disaffirmed, to grant, in its discretion, an appeal to the Court of Appeals, if the High Court of Chancery shall be of opinion, that the granting of such appeal will contribute to expedition, the saving of expense, the furtherance of justice, or the convenience of the parties; any law, custom, usage, or construction, to the conlrary, notwithstanding.”
The practice, upon a liberal construction of this statute, seems to have grown into an inconvenience on the other hand; for, in 1897 it was enacted, that “no appeal shall *252 hereafter be granted in any cause in Chancery, until a final f^ecree is pronounced, unless the Court in which such cause is or may be depending, shall think it necessary to prevent a change °f property under an interlocutory decree, and before a final decree can be pronounced.” Neither of these acts authorised an appeal, but from an interlocutory decree, which can only be made upon a hearing of the cause. They did not extend to orders made in the progress of the cause, on motion; nor after the act of 1807, to any case but where the effect of the decree was, to produce a change of property. The case of an order refusing to award an injunction, or dissolving an injunction, was not provided for, except, perhaps, in the latter case, when the decree dissolving the injunction was pronounced upon a hearing, and the effect of it was, to produce a change of property. Such a case was not likely to occur often, and even in such a case, if the Chancellor refused an appeal, the party had no remedy. To remedy these defects in relation to the awarding and dissolving injunctions, the act of 1810 was passed, authorising the Judges of the Court of Appeals, or any one of them, to award an injunction when refused by the Chancellor, or to allow an appeal from an order dissolving an injunction, without any limitation as to this power, arising out of the circumstances of the case. But, in neither of these cases had the Chancellor a power to allow an appeal, as in the case of interlocutory decrees changing property. The case of an order, on motion, refusing to dissolve, and continuing an injunction, was clearly not provided for by any of these laws. In 1815, the provision incorporated in our late revisal, before cited, was enacted. This act also allowed, at the discretion of the Chancellor, appeals from all interlocutory decrees of the County Court, without limitation. The act of 1815 extended the right of appeal-to interlocutory orders, as well as decrees. It made, for the first time, the circumstance, that the order or decree required the payment of money, one criterion on which the right of appeal depended. It adopted the act of 1807, *253 as to the circumstance of the decree producing a change of property, as another criterion, and extended it to orders, as well as decrees. It enlarged the operation of the act of 1798, by using the terms “ to settle the principles of the cause, instead of the right claimed, affirmed or disaffirmed,” if any case can occur in which it. might be proper to allow an appeal “to settle the principles of the cause,” where the decree had not affirmed or denied the light claimed. If.there could, the Legislature intended to provide for it. This act adopted the provisions of that of 1798, in relation to expense and delay; and dropped that in relation to the convenience of the parties. The act of 1810, in relation to appeals from refusals to grant, and orders dissolving injunctions, was re-enacted in the revisal of 1819, chap. 66, § 44.
Upon this view of the statutes, it is insisted, that the statute of 1815 ought to receive the same construction as that of 1798, as to the character of the decree, and that the right claimed should appear to be affirmed or denied by the order or decree in question, to justify an appeal. If this were so, it would not affect the case at bar; for, the right claimed by the plaintiff is as strongly affirmed as it possibly can be, before a final decree. It is expressly asserted by the order, and in consequence of that recognition of the right to be exempted from the payment of the judgments in question, if his title to the property in question should prove to be bad, the Court has ordered, that all proper parties to discuss the title shall be brought before the Court in that cause. They are numerous, and this order must produce great expense and delay. It is further insisted, that the 57th section ought not to be construed to extend to an order refusing to dissolve and continuing an injunction; because, if it did, there would have been no necessity for re-enacting the 44th section, in relation to the refusals to award, and the dissolving of injunctions; and that section providing the law in relation to injunctions, must be considered as exempting them from the *254 operation of the 57th section entirely. I cannot feel the force 0f this reasoning. The 44th section does not provide at all for the case of an order refusing to dissolve, aQd continuing an injunction. Such an order may' come within the terms of the 57th section, and the mischief intended to be provided for by that section. And, as there is no other declaration of the will of the Legislature as to such case, I do not see why it should be withdrawn from the operation of the general law. It might be said, truly, that in relation to the provision of the 44th section, as to refusals and dissolutions of injunctions, it ought to be considered as withdrawing those cases from the 57th section, if there be a difference between the effect of these two sections in such cases. And there is such a difference; for, a previous application to the Chancellor for an appeal, and. his refusal, are not necessary in the cases provided for in the 44th section, in order to enable the party to apply to the Judges of the Court of Appeals as they are in the cases provided for in the 57th section. The motive for adopting this distinction, probably was, that the former class of cases were commonly more, and the latter less urgent; and the object of the Legislature, in providing thus in relation to the latter class, was, probably, to save the Court, in term time, from the consumption of time necessary to examine the records, upon such applications, unless the Chancellor had previously refused an appeal. And this is made the more probable, since the jurisdiction in the other class of eases is given, not to the Court, but to the Judges out of Court. Moreover, an order for dissolving an injunction may not come within the terms of the 57th section, and yet it might be important to provide for such case; as, for instance, an injunction to a nuisance, or to stay waste, an order dissolving which would neither require money to be paid, or property changed. Nor would 'an appeal be proper, to settle the principles of the cause, or to prevent expense and delay. There might be no principle involved in the case. It might turn upon a mere *255 question of fact in issue between the parties; and it might appear, from the record, that the case would be finally heard, as a matter of course, at the next term of the Court of’ Chancery; so that an appeal would produce, instead of avoid, expense and delay. There was, therefore, good reason to retain the 44th section of the ac1, without supposing that it was intended to prohibit an appeal in cases of orders, refusing to dissolve, and continuing injunctions, which fell within the terms of the 57th section of the act. None of the reasons for the provisions of the 44th section, apply in any degree, to the last mentioned case.
T think, therefore, the appeal was properly allowed, and that the merits of the case must be examined. I have investigated this question of jurisdiction the more largely, because this is the first instance in.which the construction and effect of those statutes have been the subject of serious question in this Court. To the just decision of this case, upon its merits, a more careful examination of the facts of the case is necessary.
A piece of land in the city of Richmond was claimed by the executors of Richard Adams, as the property of their testator; by William Byrd Page, the executor of Mary . Byrd, who was executrix of William Byrd, as the property of the said William Byrd; and by the Corporation of the city of Richmond, as a common. Suits were depending in the Richmond Chancery, in which all these parties respectively asserted their claims to the property; and the devisees of Richard Adams, some of whom were infants, were also parties to these suits. The parties compromised their respective claims; and the Court, with the assent of all the adult parties,, and the guardians of the infant parties, decreed according to the compromise. By this compromise, the executors of Adams purchased the release of the claims of the Corporation of the city of Richmond to the property in question, at the price of $100,000, payable in instalments; and from William B. Page, executor of Mary Byrd, who was executrix of William *256 Byrd, a release of the claims of .the' representatives of William Byrd, for the price of $75,000, payable also in instalments. William B. Page, as executor as aforesaid, executed a release according to the contract; and the executors of Adams, with the adult devisees of Richard Adams, executed their negotiable notes to the said Page, as executor as aforesaid, for the $75,000, payable in instalments; and, as a further security for the payment of the notes, a deed of trust on the property which had been the subject of litigation and compromise.
On the 8th of March, 1819, Adams’s executors sold a house and lot (which was a part of the property which had been in controversy, and included in the deed of trust aforesaid, for the benefit of Page, executor, &c.) to Giles Picot, the plaintiff, at the price of % 13,000; of which, $4,000 were paid down (probably to Page, by direction of Adams’s executors, in part payment of the debt due from them to him,) and Picot executed to Page, at the instance of Adams’s executors, his several negotiable notes for the residue of the purchase money, payable in instalments, with a deed of trust upon the property, to secure the payment of the notes. Picot asserts, (which is admitted by Page,) that Page stipulated, in consequence of that payment, and those assurances, to release the lien which Adams had given to him, so far as it affected the property sold to Picot. Adams’s executors professed to sell to Picot, by virtue of an authority vested in them by the will of their testator; and their conveyance to him contains a warranty against all persons claiming under Richard Adams, and a covenant, that if evicted by any person having a better title than Richard Adams, he might have satisfaction out of Richard Adams’s estate, as if Richard Adams himself had conveyed with general warranty. The answer of Lomax asserts, that, in consideration of the notes of Picot, Page released so much of the debt of Adams’s executors and devisees to them; but, this fact is not proved, and cannot, therefore, be taken to exist. Pi- *257 sot admits, that he had full knowledge of the foregoing facts, in relation to the title of the property he purchased, and believed the title to be good; and that Page and Jldams’s executors acted bona fide, in the belief that the title was good. Afterwards, in December, 1819, Page offered to endorse Picot’s notes, without responsibility or recourse, to Lomax, in satisfaction of a debt of William Byrd,, which was in the hands of Lomax, for collection. Lomax having examined the decree which confirmed the compromise, and otherwise acquired full information that the notes were given for the purchase of the property, the subject of that compromise, applied to Picot, to know whether the notes would be paid at maturity; and was assured by him that they would; and, thereupon, took an assignment of the notes, without recourse against Page or Byrd’s estate, and an assignment of Picot’s deed of trust. But, preliminary to closing the contract with Page, the latter also procured an agreement from the executors and adult devisees of Jldams, that any person to whom Page should transfer Picot’s notes, should be entitled to claim, under the securities originally given to Page by them, any deficiency which might arise by the default of Picot, in the payment of his notes; Picot’s debt being first resorted to. Picot charges, that Lomax knew that his (Picot’s) title to the property, was defective, and procured this engagement, as an indemnity against the defects; which Lo-max positively denies, and affirms that he had no suspicion of any defect in Picot’s title, and procured this engagement as a security against the possible inability of Picol to pay his debt, and insufficiency of the property pledged, to secure it. And the terms of the engagement verify this assertion; for, so far from the agreement sanctioning the idea, that the parties intended to provide for the event of Picot’s debt not being due, it provides only for any deficiency arising from Picot’s default; and, after his debt had been, in the first instance, resorted to, there is some mistake in the last sentence of the agreement, which is unin *258 telligible, taken in connection with the whole tenor of the agreement. After Picol had paid his fii’st note to Lomax, - and before the second became due, he received information which inclined him to think that he had not a clear title, either to the interest of Richard Adams, William Byrd, or the Corporation of the city of Richmond, in' the property which he had purchased. Yet, after receiving that information, he wrote to Lomax, and, without hinting that he had received this information, or that he had any objection to the payment of the second note, asked some indulgence, referred to the lien on the house and lot, which he stated was good security for the debt; and offered, if the indulgence was given, to give any additional security in his power.
The objections thus discovered to the title were, 1. That the executors of Adams had no power to hind the devisees, not consenting, or of the infant devisees, by the compromise, or to purchase the claims of the City of Richmond and Byrd, at the expense of their testator’s estate, and to bind his estate for the purchase money, or to sell the property. 2. That the Corporation of the city of Richmond had no right to sell their commons. They, however, insist upon the compromise; and if it should be set aside, to be remitted to their former rights. 3. That Byrd’s representatives are dissatisfied with the compromise, and some of them are infants, (Page denies that they are dissatisfied,) and that Page, as executor of Mary Byrd, who was executrix of William Byrd, had, on various grounds, no authority to dispose of Byrd’s rights in the subject. And, upon these grounds, several of Adams’s devisees, infants at the time of the compromise, but now adults, have filed their bill for the purpose of setting aside the compromise, and every thing done in consequence of it, and to be restored to their original rights.
It is also alledged, that one of Adams’s executors is insolvent, and the other dead, and his estate probably not sufficient to make good the purchase money , to Picot, if *259 fee should be evicted, and that Page is prosecuting a suit upon the deed of trust executed to him by Adams’s executors, and claiming his lien under that deed, upon the property purchased by Picol.
Upon this case, if Adams’s executors were claiming the purchase money against. Picol, upon any possible security given by him to them, the circumstances as to the alledged defects in the title, the fact of the prosecution of a suit for impeaching the title, by those claiming under Richard Adams, and the alledged insolvency of the executors, would, unquestionably, according to the decisions of this Court, justify a Court of Equity in restraining the payment of the purchase money, until the fate of the title were ascertained; and Page would be subject to the same equity , if, (as I think it must be taken to be on this record,) he took Picot’s notes and deed of trust, as a collateral security, and not as a satisfaction for so much of the debt due to him, from Adams’s executors and devisees. What would have been the effect of his accepting it as a satisfaction of so much of that debt, need not be examined, as that fact does not appear. The real, and upon the merits, only question in the cause, is, whether Lomax’s rights are affected by Picot’s equity, as against the executors of Adams and Page.
It is admitted on all hands, that the policy of the law, in relation to negotiable securities, would exempt Lomax from any equity which Picof, may have against the parties, if he be a bona, fide holder of the notes, for full and valuable consideration, without notice of such equity, and took the assignments in a due course of trade. Was he such a holder ?
The endorsement of a negotiable security, prima, facie, imports an assignment for full and valuable consideration. In general, the onusprobundi lies upon him, who alledges the contrary. But, circumstances may exist, which may' throw upon the endorsee, the obligation to prove the consideration given.' Bui, that case cannot exist, until, the *260 question be put in issue, whether a full and valuable cousideration was given, or not. The plaintiff has notalledge(l that such consideration was not given in this case, nor does he raise any question on that point. The legal presumption, then, ought to prevail, independent of Lomax’s and Page’s express averment of a full and valuable consideration paid by him, in the release of a debt of William Byrd’s, and taking the endorsements, without recourse to Page or his testator’s estate.
The notes were assigned in the due course of trade. Every negotiable security, endorsed before it is payable, with intent to make it the absolute property of - the endorsee, is endorsed in the due course of trade. Not so, if it be endorsed after it is dishonored, or-for the use of the endorser, or as a collateral security. An endorsement, without recourse, -is not out of the due course of trade. The security continues negotiable, notwithstanding such an endorsement. Nor does such an endorsement indicate, in any ease, that the parties to it are conscious of any defect in the security, or that the endorsee does not take it on the credit of the other party or parties to the note. On the contrary, he takes it solely on their credit, and the endorser only shews thereby, that he is unwilling to make himself responsible for the payment; and in the case at bar, the refusal of Page to make himself personally responsible for the payment on the day, in default of Picot, (he having received no personal consideration for the note, but only a release of his testator’s debt,) could have excited in the endorsee no suspicion, that the security was liable to any objection, other than that it might turn out that the drawer was unable to pay, and that the security given by him might be insufficient. Nor did Page’s refusal to make himself or his testator’s estate responsible, in the event of the non-payment of the note by Picot, indicate that he ever apprehended such inability or insufficiency himself. For, as in the event of the non-payment of the notes, ¡Adams’s executors and devisees would be liable to *261 Page upon their original obligations to him, he wished, in that event, that Lomax should stand in his shoes as against them, and proceed directly against them, instead of against him or his testator’s estate; and to that end procured the stipulation from them, which accompanied his assignment of the notes to Lomax. It was merely substituting their ultimate responsibility to him, for his immediate responsibility to Lomax. Independent of this view of the object of that stipulation, the taking of a collateral security from others, does not take the endorsement out of the usual course of trade. However much the endorsee might have relied upon the credit of the drawer and the security given by him, and however confident lie might have been, in the perfect validity of the obligation of the drawer, it was but a prudent precaution, and, 1 presume, not unusual, to procure, if he could, collateral security, Lomax is, therefore, a holder for full and valuable consideration, and has taken the notes in the due course of trade. It remains to enquire, whether he is, or is not, a bona fide holder, without notice of Picoi’s equity. It is not sufficient, in order to enable the drawer to assert his equity against the holder, that the latter purchased with notice of the consideration for which a note was given, unless he knew, at the same time, that it had failed, or would probably fail, or was affected by fraud; that is, unless he knew that there was then a subsisting equity, or at least, that an equity would probably arise out ol‘ the known facts, against the note.
In all cases in which a note is given for any other consideration than money actually paid, or for a subsisting debt upon an account current, or for accommodation, an equity between the parties may arise out of subsequent events; for, in all cases, other than those above-mentioned, the consideration may fail. To declare, then, that a mere knowledge of the consideration of a note, without any knowledge or suspicion of any defect or unfairness in the consideration, then subsisting, subjects the holder to all fu *262 ture contingencies which might produce a failure of the consideration, would be to destroy the credit and negotiabilily of such securities, and counteract the policy of the *aw’ *n g^ing such credit and negotiability to such securities. The ¡principle, upon which a purchaser with notice of any existing equity is bound, is, that he acts mala fide in attempting, with a knowledge of such subsisting equity, to make the security his own, exempted from such equity, to the prejudice of another. The case of Cumming v. Brown, 9 East, 506, on a strictly analogous subject, cited at the bar, is a good commentary on this doctrine. A purchaser, without notice of any fact which, in fairness and justice, ought to .prevent him from purchasing the security, is a bona fide holder, and exempted from any equity, as between other parties. If Lomax, therefore, had known that the note was given for the purchase of real estate, and had examined the title papers, and, upon the face of those title papers, no defect of title had appeared, and a defect had afterwards appeared aliunde, it could hardly be doubted that such a defect could not have affected his rights, acquired without any suspicion of such defect. It is not the duty of a purchaser of a negotiable security, which he knows to be given for the purchase of property, to enquire into the validity of the title. That is emphatically the duty of the purchaser, before he executes his note for the purchase money. But, in this case, Lo-max did, in fact, examine the decree, and subsequent conveyances; and, upon the face of the decree, some of the objections now alledged against the title, probably appeared; although that cannot be confidently said, as a copy of that decree is not before us. He affirms, that this examination was made, with a view to ascertain whether the title to the lot pledged as a security for Picot’s debt, was good, and that he believed it to be good; and his subsequent conduct proves that he acted under this impression. If then, actual notice of a defect in the consideration, were necessary to subject him to Picot’s equity, he would be ex- *263 ,>mpted. Bui, a further question remains,, whether, in legal construction, although he was not hound to examine the title, yet, having examined it, and the defect appearing ou the title papers which he examined, he is not to he considere A as having notice of the defect, and precluded from denying it. The circumstances of ibis case render it unnecessary to deckle upon this question. For, Picot being the purchaser of .the property in question, and Hie documents under which he claimed, disclosing the allodged defects of title, if Lomax was bound to take notice of them, a fortiori Picot was also bound; and, if Lo7nax must be considered as having notice of Picol’s equity, Picot must be considered as having the same knowledge; and, with full notice of his equity, induced Lomax to take an assignment of the notes, and to part with full consideration for them, by his assurance to Lomax, upon Lo - max’s application to him upon the subject, that he would pay the notes when due, if the hardness of the times did not prevent him; and thus, relying upon the covenants in his deed, in effect waived his equity. But, the truth of the case is, that both parties were ignorant of those defects, and blameless in the transaction.
In relation to bills of exchange, Courts of Law proceed upon equitable principles. The endorsee has the legal title; and the principle, that where equity is equal, the law shall prevail, is as completely applicable at law to bills of exchange, as it is to other subjects in a Court of Equity. ' In neither Court, can any equity prevail against a purchaser for valuable consideration of the legal title, unless he be justly chargeable with mala fides. The supposition that Picot, if he paid the money, would he entitled to be substituted to the rights which Lomax would have against, Adams’s executors and devisees, for any part of Picot’s debt not paid by him, could not justify the suspension of Lomax’s remedies against Picol. Whore a party has a double security and remedy, and another has an equitable right, if he discharges the demand, to be substituted to one *264 of those remedies; if, in any case, the Court could compel the creditor to resort to that remedy, most beneficial to that other, it can only be, when such remedy is as effectual and beneficial to the creditor as that which he prefers. In this case, the one remedy is immediate; the other, if a possible remedy, is indefinitely remote. The question, whether Picot would be entitled to the benefit of such substitute, is not before the Court. If he be, it is competent to the Court of Chancery to give him that'relief. The injunction, therefore, ought to have been dissolved.
The question, as to the propriety of the terms of the original order for the injunction in this case, is not now in any way interesting to the parties in this cause. If further security should have been required, and the failure to require it has done any injury to Lomax, it cannot now be remedied; for, Picot has now no motive to give any additional security. Yet, as it is a question of great importance, and comes regularly under the consideration of the Court, it is proper to examine it.
The Court of Chancery had originally a discretion as to the terms upon which injunctions should be awarded. A sound discretion upon this subject required, that the Court should take care that the terms should be such as to ensure, with all practicable certainty, that the defendant should sustain no ultimate loss, in case the injunction should be dissolved. This discretion still remains, unless controled by statute; and, if so controled, in any respect, still remains, so far as it is not so restrained.
As long since as 1744, it was provided, that before any injunction should be granted to stay proceedings at law in any action, suit, or judgment whatsoever, the party praying the injunction should enter into bond, with security, in the Clerk’s office, for satisfying all money, tobacco, and costs then due, or which might become due, to the plaintiff in the action, suit or judgment so to be staid; and all costs which might be awarded against such party, if the injunction should be dissolved. This provision, upon the change *265 in the organization of the Courts and revisáis, was re-enacted with some modification in the phraseology, which do not affect the question under consideration, and now stands in our Code in these words: “Where any injunction shall be granted, the Clerk shall endorse upon the subpoena, that the effect thereof is to be suspended, until the party obtaining the same, shall give bond with sufficient security, in the office of the Court in which the judgment to be injoined shall have been obtained. The party obtaining the injunction shall then enter into bond with sufficient security, and file the same in the Clerk’s office of that Court in which the proceedings at law were had, for paying all money or tobacco, and costs, due or to become due to the plaintiff in the action at law, and also all such costs and damages as shall be awarded against him or her, in case the injunction shall be dissolved.”
As to cases coming within the provisions of this act, and emphatically in the case of injunctions to judgments at law, the statute is explicit and imperious, and takes from the Chancellor all discretion as to the security, as clearly as words could do, unless the statute had provided explicitly that he should have no such discretion. But, it is said, that exceptions have been allowed to the effect of those laws, upon the circumstances of the case; and tlia.1 this could only be done upon the ground, that the original discretionary power of the Chancellor or the Court, as to the terms upon which injunctions should be allowed, was not taken away by the statutes, and that, for the same reasons which have excepted the cases alluded to from the operation of the statute, all cases should be excepted, in which the security required by the act would be superfluous. The cases alluded to, are those of executors and administrators; as to which, the Courts seem uniformly to have held, that they are not bound to give security under the act; not because such security can be dispensed with in all cases, but because, upon the just construction of the law, it docs not extend to those cases, but only to cases in which *266 the party prays an injunction .in his own right. And, as a proof of this proposition, it has been said, that as the terms of the act require the party giving such bond, to stipulate absolutely for the páyment of the debt, &c., if the injunction shall be dissolved, an executor or administrator could not assert the rights of the estate which he represents, without incurring a personal responsibility, which would frequently deter such trustees from asserting such rights, Shearman, admr., Sjc. v. Christian Sr al. 1 Ran. Reja. 393, and the cases there cited; that, therefore, the act should be construed to require bond and security only from those already bound by the judgment at law; and that this construction was the more reasonable, since it could not prejudice the creditor, the executor or administrator having already given good security in general, for the due administration of the assets. Whether this reasoning justified the proposition it was intended to support, it is immaterial to enquire here. The case at bar does not fall within this reasoning. The party praying the injunction was personally bound by the judgment in-joined, and the security which he had already given for the debt, (if it could be considered as any security under the circumstances of the case,) was no security for the costs of the Court of Chancery and the damages, in case the injunction should be dissolved, if any should be awarded. Nor can any apparent equity in the plaintiff's case, take it out of the statute; for, it is always possible that the defendant may not be affected by such equity, and that the injunction may be dissolved. When no equity is asserted against the judgment at law, the statute does notapply to the case; and the cases supposed at the bar, in which the statutory security would not be required, are cases in which some right would be asserted, not against, but collateral to the judgment.
But, even if the statute did not, in any case, restrain the originial discretion of the Chancellor, in respect to the terms upon which injunctions should be granted, that dis *267 •eretion was improvidently exercised in this case. The plaintiff alledged in his bill, that, the title to the property which he had pledged as a security for the debt, was seriously impeached, and that was the ground of the injunction. It was possible, that the defendant might still be entitled to claim the debt, although the title to the property was utterly worthless; in which event, the creditor would he left entirely without security, and might lose his debt in consequence of the interposition of the Court. And, even if the title proved to he good, he would be without, security for the costs, both at law and in equity, and the damages allowed by law, upon' dissolving injunctions, if they should bo awarded. The strong opinion of the Chancellor in favor of the justice of the plaintiff’s claim to relief, did not make this course the less improvident. For, it was still possible, that the defendant had the better equity.
The older refusing to dissolve the injunction, should he reversed, the injunction dissolved, and the cause remanded to be further proceeded in.
Judge Coalter.
The first question which presents itself is, whether thk appeal has been improvidently granted or not ?
It is contended, that as well the order in vacation awarding the injunction, without requiring security, and the refusal in Court to discharge it unless security was given, as the refusal to dissolve after the answer was filed, were decisions on the merits of the case, against the appellant; that those decisions are erroneous; and that the latter particularly, comes within the provisions of the 57th section of the act concerning Courts of Chancery, and, consequently, an appeal lies therefrom. By that section it is provided, that the Court of Chancery j or the Judge in vacation, may grant an appeal from any interlocutory order or decree;, where money is required to be paid, or *268 the possession or title to property to be changed, or that £[le 0ourt shall think such appeal proper, in order to settle the principles of the cause, or to avoid expense and delay. The first enquiry then, is, whether these decisions, or either of them, were adjudications on the principles of the cause; and the second is, whether those proceedings, or either of them, are such orders or decrees as come within the purview of the act of Assembly, so as to make an appeal proper, in order to settle those principles.
As to the award of the injunction without requiring security, it appears to me that that must have proceeded on these assumptions: 1st. That the title of the land might prove defective, and although, if it did, it would be no • security for the debt; yet, 2ndly. That the defendant could not possibly shew any thing in defence, which would entitle him to a dissolution of the injunction, should that ti- • tie ultimately prove defective. In other words, that notwithstanding the negotiability of the paper, or any direct waiver of equity which might have taken place, the appellant could not be entitled to the money, provided the title to the lot proved defective. The bill alledges this defect, or probable defect of title, as the only ground for equitable interference, and consequently, that the house and lot were no security for the debt, in case the appellant should be entitled to recover it, notwithstanding such defect.
That injunctions may be awarded without security, in cases not coming within the intention of the law, as in cases of executors, administrators, or other fiduciary characters, when they are not personally responsible, or in some other cases mentioned at the bar, there never has been any doubt; but, whether this can be done in consequence of peculiar circumstances, in cases coming within the act, according to the sound discretion of the Chancellor, and on what terms, I think it most proper not to decide, as such decision would be ex parte, no such case being alledged in the present bill. As to this case, I think the award of the *269 injunction, and the refusal to discharge it for want of security, were irregular, and, in one aspect, amount to a decision upon the merits, against the appellant, before 1he filing of the answer.
As to the second point, viz: the refusal to dissolve the injunction after the answer was filed; it seems to me, that as that answer mainly relies on a defence not at all affected by the question of good or had title, it may be likened to the ca.se of an assigned bond, where the obligor asserts an equity against the obligee, which, he alledges, affects the assignee, and against which the latter defends himself on grounds not connected with the equity asserted against the obligee, and insists that he is not bound to await the expense and delay, attending the litigation with the obligee. If this is the nature of the defence, and that defence is made good, it would surely be against equity, to withhold the debt from the assignee, until this dispute with the obligee, by which, be it settled as it may, he cannot he affected, shall be decided. Suppose the Chancellor, however, thinks the defence is not made out, and refuses to dissolve; yet, surely, if he thinks the case one of doubt, and in which he may be mistaken, it would not be improper in him to grant an appeal, in order to have the principles settled, as well for the sake of justice, as to avoid expense and delay to the party, provided such refusal is an order or decree within the purview of the statute. He will doubtless refuse, when he thinks the decision is clearly correct; but, should a Judge of this Court think differently, he would have the same right to grant the appeal as the Chancellor had.
The main defence in this case, is one of this kind. The Chancellor has decided against it, and would have allowed an appeal, but he thinks the refusal to dissolve is not an order or decree within the meaning of the act.
There was no application to him for an appeal from the refusal to discharge the injunction, unless security was given. As to this latter, it might, on this ground perhaps, *270 if no other, he doubted whether it would be competent for a Judge of this Court to grant an appeal from it, even if an appeal lajq there being' no refusal of the Chancellor to grant such appeal therefrom, other than considering it as a part of the case in which, and from the subsequent order in which, the appeal was prayed.
Having doubts, however, on grounds independent of this, whether an appeal would lie from the refusal to discharge the injunction for want of security, and having done every thing which can a t present be of consequence to the party, or useful to the public, by the opinion above expressed as to those proceedings, I think it best to decline any opinion on that point, and shall confine my decision to the question, whether the appeal was properly granted, from the order refusing to dissolve the injunction, after the filing of the answer.
I think this order disaffirms the main defence relied on; and that if such disaffirmance is incorrect, and if the correction of it by this Court must be suspended until the incalculable expense and delay of the suits, now pending, to settle the title to this property, are incurred, a case of hardship more clearly within the reason of the law, can hardly be imagined. If the decision, then, brings the party within the reason of the law, the words, I think, are broad enough to extend the remedy to him, and, consequently, this is an order or decree, from which an appeal lies.
The next question is, whether the decree is correct ?
, Whatever may be the equity of the appellee against _ Adams, or against Page, or whether there is such equity or not, I do not consider it important at present to enquire, • inasmuch as I think the appellant stands on higher ground than either. He must be taken as the bona fide endorsee of the notes in question, for full value, unless, indeed, notice of the failure, or probable failure, of the consideration of the notes, can be brought home to him, so as to destroy that bona fide character of the transaction, on which he *271 relies, and the impeachment of which is the only ground of equity relied on in the bill. The bill itself admits, that a previous communication took place between the appellant and appellee, before the endorsement, and that no express notice was given by the latter to the former, of any possible, much less probable, failure of the consideration; for, in truth, that none such had ever been thought of, and that, consequently, a promise of payment was made.
If the appellee knew at that time, that the title might prove defective, and, notwithstanding gave the promise, it would be a waiver of his equity, as that promise induced the purchase of the notes; and this, I presume, oven if he had told Lomax of the state of the title, and his know - ledge of its defects, so as to give him. the same information that he possessed himself, but agreed to take tha1 risque on himself, and to pay at all events. This would be to extend a credit to the drawer, as in case of a note for accommodation.
But, it is alledged, that the appellee was ignorant of any defect in the title; but, that the appellant knew of the defect, and, concealing that knowledge, procured a promise to pay the purchase money-; by this moans, seeking to bind him to pay for the lot at all events, although he knew the title might prove defective. This charge is denied in the answer; and the proof of it, is the admission, that the appellant had precisely the same knowledge of the title, and the same belief of its goodness, that the appellee had. Both knew the nature of the title; but, it is insisted, that the appellant was hound to know the law, and that the title might, bo disputed; and, therefore, the bona Jides of the transaction is destroyed, and the mala fides proved. On the contrary, I think that the appellee, who was the purchaser of the land, was more bound to know the la.w, and its bearing on his title, than the appellant. He ought to have looked to this; and, it is more reasonable to presume that he did know the law, as it regarded his own *272 title, before he induced the appellant to purchase the notes, (jlall to say, that after such promise, the appellant must take the notes at his risque. To charge the appellant, it ought to appear that he in fact had a knowledge of a defect in the title, which the appellee had not; and that, notwithstanding this, he had procured the promise under a concealment of his knowledge of the title. Nothing of this kind is pretended.
Both parties, in fact, are equally innocent, or equally guilty; or, if there is any difference, it is against the purchaser, who, with a knowledge of the nature of his title, induced the appellant to lay out his money in the notes. This being the case, the appellant, who has the law on his side, must prevail.
I think, therefore, that the injunction ought to be dissolved, and must now be dissolved.
Judge Brooke.
The injunction in this case was granted on terms, to be ascertained by a commissioner, and on whose report the Clerk, and not the Chancellor, was to judge of the sufficiency of the security, without affording to the appellant an opportunity to object to that report, and to shew that the security was insufficient. This course was certainly not within any of the exceptions stated by the bar, nor consistent with the provisions of the 113th and 114th sections of the act concerning Superior Courts of Chancery. 1 Rev. Code, p. 218. It was further in violation of that act, because, in effect, no security was given, inasmuch as an alledged defect in the title to the lot conveyed by the deed of trust was the ground of the application for the injunction, which, if true, deprived the appellant of the security required by the act; and, if untrue, removed the foundation of the interposition of the Court of Chancery. There being nothing in the act authorising an appeal from those proceedings, the appellant moved the Court of Chan- *273 eery to dissolve the injunction, unless sufficient security was given. No appeal was taken from the refusal of the'Chanccllor to dissolve the injunction; and it is not necessary to decide, under what circumstances, if under any, an appeal would lie, in such case. At a subsequent period another motion was made by the appellant, to dissolve the injunction, on the merits; which, being again refused by the Chancellor, an appeal was allowed by one of the Judges of this Court, in vacation. If that appeal is sanctioned by the act aforesaid, the appellant will be let in to object to the terms on which the injunction was granted, and to the refusal of the Chancellor to dissolve it, although the security required by the act was not taken. Whether the appeal was providently allowed by the Judge of this Court, will depend on a correct construction of the 57th section of the act before referred to. By that section, an appeal is allowed from any interlocutory order or decree, by which money is required to he paid, or the title or possession of property is to be changed, or the Court shall think such appeal proper to settle the principles of the cause, or to avoid expense or delay. By the interlocutory order, refusing to dissolve the injunction, on the merits, I think the principles of the cause were so far settled, as to come within one of the provisions of the section. It was also calculated to produce the expense and delay intended to be avoided by the act. The refusal to dissolve the injunction, is, in substance, stated to he, because, by the facts in the case, the appellant had placed himself in the shoes of the vendors of the lot in question, and was subject to all the equity that would affect them, until the title was cleared up by decrees ,to be made in the suits referred to in the order then pending in the Court of Chancery, in which the appellant was no party, and as to which new parties were to be made, involving great delay and expense. Whether the appellant was to be affected by this undecided equity against the vendors, was the real point in controversy between him and the appellee. As to his rights, the principles of the cause were *274 decided by the order to dissolve the injunction; and, wh^her by a direct order to that effect, or by consequence from the grounds taken by the Chancellor, was not mate-I'iak It was substantially an interlocutory order, within the meaning of the section, and justified an appeal from it. That appeal brings up the whole proceedings in the case. The irregularities before stated in granting the injunction, and refusing to dissolve it on the first motion, are all properly before this Court, and liable to the objections before stated.
In the view that I have taken of the merits, it is not necessary to investigate the supposed equity against the vendors of the property. Whether Page was authorised by the will of Byrd to make the compromise, or whether the executors of Adams had authority to sell the property to the appellee, arc matters" not decided by the Chancellor, and depend on an investigation to be made in the causes referred to, the proceedings in which are not before the Court. The only question is, whether the appellant is to be affected by any equity against those parties, if any exists. If he is not to protect himself by their rights, it is not necessary to examine them as against the appellee, even if the causes involving that enquiry were before the Court. Before the appellant received the notes of Page, in discharge of the debt due by Byrd’s estate, it is not pretended that he had the slightest interest in this enquiry. His claim upon Page, as executor of Byrd, grew out of a totally distinct transaction. Holding the claim against Page, he might enforce it, if Page did not pay it, without regard to these enquiries. It does not appear that he had any interest in receiving the notes of the appellee, in preference to any other mode of payment that might have been resorted to by Page. The notes were offered in payment; yet the appellant would not receive them, until he was assured by the appellee that .they would be paid when they fell due, if not prevented by the hardness of the times. The proposal by Page, as executor of Byrd, *275 to endorse the notes without recourse, and to assign the deed of trust, was not calculated to give the appellant any alarm, as to the nature of the consideration on which the notes were given. As executor, Page was not bound to make himself personally responsible for the debt, nor to the hazard of a protest in the bank, in the event that they were not punctually paid. It was proper, also, to protect the assets of his testator, by assigning the deed of trust. The taking collateral security by the appellant, was also a, reasonable caution against the insolvency of the appellee, though no reasonable suspicion of his liability to pay existed. If, however, these circumstances put the appellant upon an enquiry into the consideration for which the notes were given, he made the enquiry, and was assured that they would be paid. The appellee possessed as much information as to the nature of his title, when he gave the assurance, as the appellant, and ought to have possessed more. Perhaps he relied on the covenants in his deed, the validity of which concerned him, and not the appellant. If the latter is not to be protected by the principles that govern the negotiability of the notes, he might rely on superior equity, at least on equal equity, and protect himself by his judgments at law. But no bad faith is imputed to him. He received the notes in discharge of a bona fide debt, paid valuable consideration for them, and is entitled to the full benefit of their negotiability. In every point of view, I think that the injunction ought to have been dissolved by the Chancellor, on the merits.
The decree is, therefore, reversed, the injunction dissolved, and the cause remanded.

Judge Cabell, absent from indisposition.